JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Kristina Kipp, Vincent Distefano, Carol Eberl, Anjani Tripathi, Chhavi Chaturvedi, Srikanth Kalvakotavenkata, Shalini Marka, David Lai, Rahul Pudi and Anusha Chillakuru and all others similarly situated

**(b)** County of Residence of First Listed Plaintiff    Chester County, PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103

## DEFENDANTS
Weyerhaeuser Company

County of Residence of First Listed Defendant    King County, WA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☒ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & / ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Pharmaceutical Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | Liability / ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| (Excludes Veterans) | ☐ 340 Marine / Injury Product | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and |
| ☐ 153 Recovery of Overpayment | ☐ 345 Marine Product / Liability | **LABOR** | **SOCIAL SECURITY** | Corrupt Organizations |
| of Veteran's Benefits | Liability / **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ |
| ☐ 195 Contract Product Liability | Product Liability / ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | Exchange |
| ☐ 196 Franchise | ☐ 360 Other Personal / Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| | Injury / ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - / Product Liability | Leave Act | | ☐ 893 Environmental Matters |
| | Medical Malpractice | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | Income Security Act | or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate | | 26 USC 7609 | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ / Sentence | | | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations / ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - / ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment / **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - / ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other / ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education / ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(d)
Brief description of cause:
Plaintiffs have sustained damages proximately caused by Weyerhaeuser's TJI Joists with Flak Jacket Protection.

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $   5,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE   09/01/2017

SIGNATURE OF ATTORNEY OF RECORD   (PA No. 85957)

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**    **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**    **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**    **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.**    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**    **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**    **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**    **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| Kristina Kipp, et al | : | CIVIL ACTION |
| v. | : | 17  3958 |
| Weyerhaeuser Company | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
   and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
   exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
   commonly referred to as complex and that need special or intense management by
   the court. (See reverse side of this form for a detailed explanation of special
   management cases.)          (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.

| 9/1/2017 | Shanon J. Carson | Plaintiffs |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-875-4656 | 215-875-4604 | scarson@bm.net |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

SEP - 1 2017

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff:  Kristina Kipp and Vincent DeStephano, 614 Kent Court, Chester Springs, PA 19425 (Chester County)

Address of Defendant:  Weyerhaeuser Corporation 220 Occidental Ave. S., Seattle, WA 98104 (King County)

Place of Accident, Incident or Transaction:  614 Kent Court, Chester Springs, PA 19425 and thousands of other structures that incorporate Weyerhaeuser's TJI Joists with

Flak Jacket Protection.                                    *(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))            Yes☐    No☒

Does this case involve multidistrict litigation possibilities?            Yes☒    No☐

*RELATED CASE, IF ANY:*

Case Number: _____    Judge _____    Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐    No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☐    No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐    No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐    No☒

---

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☒ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

---

### ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, Shanon J. Carson _____, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒ Relief other than monetary damages is sought.

DATE:  9/1/2017 _____    _____ Attorney-at-Law    85957 _____ Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

---

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE:  9/1/2017 _____    _____ Attorney-at-Law    85957 _____ Attorney I.D.#

CIV. 609 (5/2012)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KRISTINA KIPP, VINCENT DISTEFANO, CAROL EBERL, ANJANI TRIPATHI, CHHAVI CHATURVEDI, SRIKANTH KALVAKOTAVENKATA, SHALINI MARKA, DAVID LAI, RAHUL PUDI and ANUSHA CHILLAKURU on behalf of themselves and all others similarly situated, | Civil Action No. _____ |
| | **COMPLAINT -- CLASS ACTION** |
| | **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| WEYERHAEUSER COMPANY, | |
| Defendant. | |

Plaintiffs Kristina Kipp, Vincent DiStefano, Carol Eberl, Anjani Tripathi, Chhavi Chaturvedi, Srikanth Kalvakotavenkata, Shalini Marka, David Lai, Rahul Pudi and Anusha Chillakuru (together, "Plaintiffs"), through their undersigned counsel, on behalf of themselves and all others similarly situated, bring this action against Defendant Weyerhaeuser Company ("Weyerhaeuser" or "Defendant"). In support hereof, Plaintiffs allege as follows:

**NATURE OF THE ACTION**

1.       Plaintiffs bring this class action against Weyerhaeuser individually and on behalf of all persons and entities who own or who have signed contracts to purchase homes or other structures located in the Commonwealth of Pennsylvania and across the United States in which Weyerhaeuser's TJI Joists with Flak Jacket Protection (the "Joists") are or were installed (the "Class").

2.     This lawsuit arises out of damages sustained by Plaintiffs and the Class that were proximately caused by Weyerhaeuser's defective Joists used in the construction of Plaintiffs' and Class members' homes and other structures.

3.     Weyerhaeuser manufactured the defective Joists, and since at least December 2016, sold and distributed the Joists throughout Pennsylvania and the United States for installation in homes and other structures. At all times, Weyerhaeuser marketed and represented the Joists to include "[a]ll the quality and cost-efficiency you expect from [Weyerhaeuser's] Trus Joist engineered lumber products." Weyerhaeuser touted the Joists to be "[e]xtremely durable," "not requir[ing] special handling or storage." Weyerhaeuser sold the Joists with a fully transferable warranty that warranted against "manufacturing defects" and remained in effect for "the lifetime of the structure."

4.     Despite these representations that were uniformly made to all customers, however, the Joists are defectively designed and defectively manufactured, such that they emit noxious and toxic gases that are harmful to humans. The Joists' "Flak Jacket" coating includes a formaldehyde-based resin that results in the "off-gassing" of formaldehyde far in excess of acceptable levels and causes other serious air quality issues.

5.     Short-term human exposure to formaldehyde for periods as short as 15 minutes has been shown to cause respiratory irritation, headaches, coughing, dizziness, and nausea. Chronic and long-term exposure to formaldehyde is linked to increased risk of cancer of the nose and sinuses, nasopharyngeal and oropharyngeal cancer, lung cancer, and leukemia. Formaldehyde also causes burning eyes, nose and throat irritation, and joint pain. It has also been linked to the exacerbation of asthma in formaldehyde-sensitive individuals and poses a particularly acute risk to children.

6.      The defective nature of the Joists is so severe that Plaintiffs' and Class members' homes and other structures are uninhabitable. The Joists require immediate repair, removal and/or replacement.

7.      Recognizing the serious, dangerous problems with the Joists, Weyerhaeuser "has halted all production, sales and shipments of the product."[1] Occupants of homes containing the Joists have been advised to vacate their residences.

8.      Plaintiffs seek to recover, for themselves and the Class, all costs associated with repairing, removing and/or replacing the Joists, and all costs of repairing any related damage to other property. Plaintiffs and the Class also seek damages for diminution of the value and future value of their homes and all out-of-pocket expenses related to dealing with these problems, including, without limitation, expenses related to delays in settlement and relocation expenses, as well as time spent away from work to address these issues. Plaintiffs also seek injunctive relief requiring Weyerhaeuser to pay for ongoing monitoring of the formaldehyde levels in Plaintiffs' and Class Members' homes and for appropriate medical monitoring. Plaintiffs further seek a Court Order requiring Weyerhaeuser to modify its warranty claims process to uniformly provide relief in accordance with all of its obligations under the law, and a declaration from the Court concerning the defective nature of the Joists.

---

[1] http://investor.weyerhaeuser.com/2017-07-18-Weyerhaeuser-issues-statement-regarding-TJI-R-Joists-with-Flak-Jacket-R-Protection (last visited 9/1/2017).

## PARTIES

*Plaintiffs*

9.      Plaintiffs Kristina Kipp and Vincent DiStefano, Carol Eberl, Anjani Tripathi and Chhavi Chaturvedi, Srikanth Kalvakotavenkata and Shalini Marka, David Lai, and Rahul Pudi and Anusha Chillakuru are residents of Pennsylvania.

*Defendant Weyerhaeuser Company*

10.      Defendant Weyerhaeuser Company ("Defendant" or "Weyerhaeuser") is a Washington corporation with its principal place of business located at 220 Occidental Ave. S., Seattle, WA 98104. Weyerhaeuser is one of the world's largest forest products companies, controlling 13.1 million acres of timberlands, primarily in the United States, and managing additional timberlands under long-term licenses in Canada. In 2016, Weyerhaeuser generated over $6.3 billion in sales.

## FACTUAL ALLEGATIONS RELATED TO PLAINTIFFS

*Plaintiffs Kristina Kipp and Vincent DiStefano*

11.      Kristina Kipp and Vincent DiStefano are the original owners of a Chester Springs, Pennsylvania home built in 2017 with Weyerhaeuser's TJI Joists with Flak Jacket Protection.

12.      Ms. Kipp, Mr. DiStefano, and their daughter moved into their new house in early June 2017.

13.      While organizing the home's basement, Ms. Kipp and Mr. DiStefano noticed a strong odor. Further, while the family was in the basement, their daughter – age eleven months – experienced physical symptoms consistent with exposure to elevated formaldehyde levels, including red and tearing eyes, in addition to respiratory distress, prompting physician evaluation.

4

14.     In late July 2017, Ms. Kipp and Mr. DiStefano received a letter from their builder, Pulte Homes, noting that Ms. Kipp and Mr. DiStefano's home contained defective Joists.

15.     Testing in Ms. Kipp and Mr. DiStefano's home has confirmed excessive levels of formaldehyde, even on the levels of the home above the basement.

16.     Despite the fact that Weyerhaeuser had not warned Ms. Kipp and Mr. DiStefano about the dangers of remaining in their home, Ms. Kipp and Mr. DiStefano were advised by a pulmonologist, an oncologist, a pediatrician, and several emergency medicine physicians, in addition to the Poison Control Center at The Children's Hospital of Philadelphia, that they should vacate their home.  Heeding this advice, Ms. Kipp, Mr. DiStefano and their daughter are now living in a hotel.

17.     Ms. Kipp, Mr. DiStefano and their daughter were exposed to formaldehyde off-gassing caused by the formaldehyde resin in Weyerhaeuser's Joists for the approximately two months that they lived in the home.

18.     Weyerhaeuser has offered Ms. Kipp and Mr. DiStefano options to address the problem with the defective Joists, including (a) covering the Joists with a layer of paint; or (b) replacing the Joists with other joists. These purported solutions are inadequate. Experts and building trade professionals have recommended that Weyerhaeuser's proposed "paint protocol" is not an appropriate solution. Furthermore, the second option comes with many risks and would require Ms. Kipp and Mr. DiStefano to incur other consequential and ancillary costs.

19.     Moreover, the presence of the Joists, if not completely removed from the house, will diminish the resale value of Ms. Kipp and Mr. DiStefano's new home.

20.     The presence of the Joists, even if removed, will necessitate ongoing monitoring to ensure that the home does not have dangerous levels of formaldehyde. Medical monitoring for Ms.

5

Kipp, Mr. DiStefano and their daughter is also necessary given their exposure to dangerous and unsafe levels of formaldehyde gases.

21.     Ms. Kipp and Mr. DiStefano have already incurred, and will continue to incur, lost time and expenses in dealing with the problems caused by the Joists, and have incurred other damages, including loss of enjoyment and use of their home, among other things.

***Plaintiff Carol Eberl***

22.     Carol Eberl is the original owner of a Chester Springs, Pennsylvania home built in 2017 with Weyerhaeuser's TJI Joists with Flak Jacket Protection.

23.     Ms. Eberl closed on her new house on July 10, 2017, and spent the next few weeks in the home repainting the entire home and performing finishing work, including custom millwork and customization of the closets, pantry, laundry room, garage, powder room and basement.

24.     A strong odor is apparent in Ms. Eberl's home immediately upon entering the front door.

25.     On July 21, 2017, eleven days after settlement, Ms. Eberl received an undated letter from her builder, Pulte Homes, noting that Ms. Eberl's home may have "a potential issue with a component of [her] home."

26.     In late July, Ms. Eberl received a phone call from a representative of Pulte Homes, advising Ms. Eberl that her home may contain defective Joists and recommending that she contact Weyerhaeuser's customer care service to discuss possible relocation and remediation.

27.     Ms. Eberl has experienced physical symptoms consistent with exposure to elevated formaldehyde levels, including, irritated, burning and dry eyes, and blurry vision.  Ms. Eberl also developed a cough.  Ms. Eberl's ocular and respiratory issues have necessitated several visits to the doctor.  Ms. Eberl has been diagnosed with chemical conjunctivitis, has been prescribed

steroids for her eyes, and still suffers from burning, dry eyes. Ms. Eberl had plugs placed into both of her eyes in an attempt to alleviate her continuing symptoms.

28.    Testing in Ms. Eberl's home has confirmed excessive levels of formaldehyde, even on the levels of the home above the basement.

29.    Ms. Eberl was exposed to formaldehyde off-gassing caused by the formaldehyde resin in Weyerhaeuser's Joists during the time she spent in the home and is currently living in a hotel, unable to occupy her brand new home.

30.    Weyerhaeuser has offered Ms. Eberl options to address the problem with the defective Joists, including (a) covering the Joists with a layer of paint; or (b) replacing the Joists with other joists. These purported solutions are inadequate. Experts and building trade professionals have recommended that Weyerhaeuser's proposed "paint protocol" is not an appropriate solution. Furthermore, the second option comes with many risks and would require Ms. Eberl to incur other consequential and ancillary costs.

31.    Moreover, the presence of the Joists, if not completely removed from the house, will diminish the resale value of Ms. Eberl's new home.

32.    The presence of the Joists, even if removed, will necessitate ongoing monitoring to ensure that the home does not have dangerous levels of formaldehyde. Medical monitoring for Ms. Eberl is also necessary given her exposure to dangerous and unsafe levels of formaldehyde gases.

33.    Ms. Eberl has already incurred, and will continue to incur, lost time and expenses in dealing with the problems caused by the Joists, and has incurred other damages, including loss of enjoyment and use of her home, among other things

*Plaintiffs Anjani Tripathi and Chhavi Chaturvedi*

34.     Anjani Tripathi and Chhavi Chaturvedi are the original owners of a Chester Springs, Pennsylvania home built in 2017 with Weyerhaeuser's TJI Joists with Flak Jacket Protection.

35.     Mr. Tripathi, Ms. Chaturvedi and their two children moved into their new house in mid-June 2017.

36.     Immediately upon moving into the home, Mr. Tripathi and Ms. Chaturvedi noticed a strong odor. When in their basement, Mr. Tripathi and Ms. Chaturvedi have experienced physical symptoms consistent with exposure to elevated formaldehyde levels, including, without limitation, irritation and burning in the eyes.  In unfinished areas of the basement, Mr. Tripathi's and Ms. Chaturvedi's eyes burn within a few seconds.

37.     On July 21, 2017, Mr. Tripathi and Ms. Chaturvedi received a letter from their builder, Pulte Homes, noting that Mr. Tripathi and Ms. Chaturvedi's home contained defective Joists.

38.     Testing in Mr. Tripathi and Ms. Chaturvedi's home has confirmed excessive levels of formaldehyde, even on the levels of the home above the basement.

39.     Weyerhaeuser has now warned Mr. Tripathi and Ms. Chaturvedi not to go into their basement for more than five minutes at a time because it would be hazardous to their health.

40.     Mr. Tripathi, Ms. Chaturvedi and their children have been exposed for approximately two months to formaldehyde off-gassing caused by the formaldehyde resin in Weyerhaeuser's Joists.

41.     Weyerhaeuser has offered Mr. Tripathi and Ms. Chaturvedi options to address the problem with the defective Joists, including (a) covering the Joists with a layer of paint; or (b)

replacing the Joists with other joists. These purported solutions are inadequate. Experts and building trade professionals have recommended that Weyerhaeuser's proposed "paint protocol" is not an appropriate solution. Furthermore, the second option comes with many risks and would require Mr. Tripathi and Ms. Chaturvedi to incur other consequential and ancillary costs.

42.     Moreover, the presence of the Joists, if not completely removed from the house, will diminish the resale value of Mr. Tripathi and Ms. Chaturvedi's new home.

43.     The presence of the Joists, even if removed, will necessitate ongoing monitoring to ensure that the home does not have dangerous levels of formaldehyde. Medical monitoring for Mr. Tripathi, Ms. Chaturvedi and their children is also necessary given their exposure to dangerous and unsafe levels of formaldehyde gases.

44.     Mr. Tripathi and Ms. Chaturvedi have already incurred, and will continue to incur, lost time and expenses in dealing with the problems caused by the Joists, and have incurred other damages, including loss of enjoyment and use of their home, among other things.

***Plaintiffs Srikanth Kalvakotavenkata and Shalini Marka***

45.     Srikanth Kalvakotavenkata and Shalini Marka are the original owners of a Chester Springs, Pennsylvania home built in 2017 with Weyerhaeuser's TJI Joists with Flak Jacket Protection.

46.     Mr. Kalvakotavenkata, Ms. Marka and their son moved into their new house in early April 2017.

47.     Mr. Kalvakotavenkata, Ms. Marka and their son have experienced physical symptoms consistent with exposure to elevated formaldehyde levels.   For example, Mr. Kalvakotavenkata has suffered from itchy, burning eyes.  Mr. Kalvakotavenkata and Ms. Marka's

fifteen month old son developed nasal congestion and a fever after playing in the home's basement. Both he and Ms. Marka were ill for a period of approximately three weeks.

48.     In late July 2017, Mr. Kalvakotavenkata and Ms. Marka received a letter from their builder, Pulte Homes, noting that Mr. Kalvakotavenkata and Ms. Marka's home contained defective Joists.

49.     Testing in Mr. Kalvakotavenkata and Ms. Marka's home has confirmed excessive levels of formaldehyde, even on the levels of the home above the basement.

50.     Weyerhaeuser has now warned Mr. Kalvakotavenkata and Ms. Marka not to go into the unfinished area of their basement for more than five minutes at a time, but has not advised them to stay out of the finished portion of the basement.

51.     Mr. Kalvakotavenkata, Ms. Marka and their son have been exposed to formaldehyde off-gassing caused by the formaldehyde resin in Weyerhaeuser's Joists for approximately four months.

52.     Weyerhaeuser has offered Mr. Kalvakotavenkata and Ms. Marka options to address the problem with the defective Joists, including (a) covering the Joists with a layer of paint (initially, the Weyerhaeuser representative told Mr. Kalvakotavenkata that Weyerhaeuser would only paint the portions of the Joists that were exposed); or (b) replacing the Joists with other joists. These purported solutions are inadequate. Experts and building trade professionals have recommended that Weyerhaeuser's proposed "paint protocol" is not an effective solution. Furthermore, the second option would take six to eight months and require Mr. Kalvakotavenkata and Ms. Marka to incur other consequential and ancillary costs.

53.     Moreover, the presence of the Joists, if not completely removed from the house, will diminish the resale value of Mr. Kalvakotavenkata and Ms. Marka's new home.

54.     The presence of the Joists, even if removed, will necessitate ongoing monitoring to ensure that the home does not have dangerous levels of formaldehyde. Medical monitoring for Mr. Kalvakotavenkata, Ms. Marka and their son is also necessary given their exposure to dangerous and unsafe levels of formaldehyde gases.

55.     Mr. Kalvakotavenkata and Ms. Marka have already incurred, and will continue to incur, lost time and expenses in dealing with the problems caused by the Joists, and have incurred other damages, including loss of enjoyment and use of their home, among other things.

***Plaintiff David Lai***

56.     David Lai is the original owner of a Chester Springs, Pennsylvania home built in 2017 with Weyerhaeuser's TJI Joists with Flak Jacket Protection.

57.     Mr. Lai closed on his new house on July 18, 2017 and moved in on July 20, 2017.

58.     Mr. Lai participated in two walkthroughs before closing on the home. While in the basement during both of these walkthroughs he immediately noticed a strong odor, and his eyes watered and felt as if they were being sandblasted. Mr. Lai was led to believe that the condition was the result of sawdust in the air, which would go away. Further, during the first of these walkthroughs, Mr. Lai's girlfriend could only make it four or five steps down into the basement before becoming nauseous and needing to run out.

59.     After taking possession of the home, Mr. Lai spent time in the basement for home improvement and organizational purposes.

60.     The smell in Mr. Lai's basement remains potent and the effects of being in the basement remain unbearable. Even in his first floor office, Mr. Lai experienced physical symptoms consistent with exposure to elevated formaldehyde levels, including tingling eyes, headaches and dizziness.

61.    On July 21, 2017, three days after settlement, Mr. Lai received a letter from his builder, Pulte Homes, noting that Mr. Lai's home contained defective Joists.

62.    Testing in Mr. Lai's home has confirmed excessive levels of formaldehyde, even on the levels of the home above the basement.

63.    Mr. Lai and his girlfriend have been exposed to formaldehyde off-gassing caused by the formaldehyde resin in Weyerhaeuser's Joists since they moved into the home and were forced to vacate their brand new home.

64.    After vacating the home, Mr. Lai had to check into an urgent care center to address the eye irritation and dryness, throat irritation, coughing, dizziness and headaches he was experiencing.  Mr. Lai continues to suffer from dry eyes, requiring the use of eye drops several times every day.

65.    Weyerhaeuser has offered Mr. Lai options to address the problem with the defective Joists, including (a) covering the Joists with a layer of paint, or (b) replacing the Joists with other joists. These purported solutions are inadequate. Experts and building trade professionals have recommended that Weyerhaeuser's proposed "paint protocol" is not an appropriate solution. Furthermore, the second option comes with many risks and would require Mr. Lai to incur other consequential and ancillary costs.

66.    Moreover, the presence of the Joists, if not completely removed from the house, will diminish the resale value of Mr. Lai's new home.

67.    The presence of the Joists, even if removed, will necessitate ongoing monitoring to ensure that the home does not have dangerous levels of formaldehyde. Medical monitoring for Mr. Lai and his girlfriend is also necessary given their exposure to dangerous and unsafe levels of formaldehyde gases.

68.     Mr. Lai has already incurred, and will continue to incur, lost time and expenses in dealing with the problems caused by the Joists, and has incurred other damages, including loss of enjoyment and use of their home, among other things.

***Rahul Pudi and Anusha Chillakuru***

69.     Rahul Pudi and Anusha Chillakuru are the original owners of a Chester Springs, Pennsylvania home built in 2017 with Weyerhaeuser's TJI Joists with Flak Jacket Protection.

70.     Mr. Pudi and Ms. Chillakuru moved into their new house in mid-May 2017.

71.     Immediately upon moving into the home, Mr. Pudi and Ms. Chillakuru noticed an odor. When in their basement, Mr. Pudi and Ms. Chillakuru have experienced physical symptoms consistent with exposure to elevated formaldehyde levels, including Ms. Chillakuru suffering irritation and redness of the eyes.

72.     In late July 2017, Mr. Pudi and Ms. Chillakuru received a letter from their builder, Pulte Homes, noting that Mr. Pudi and Ms. Chillakuru's home contained defective Joists.

73.     Testing in Mr. Pudi and Ms. Chillakuru's home has confirmed excessive levels of formaldehyde, even on the levels of the home above the basement.

74.     Weyerhaeuser has now advised Mr. Pudi and Ms. Chillakuru not to use their basement and to open their windows so the toxic gases could escape.

75.     Mr. Pudi and Ms. Chillakuru were exposed to formaldehyde off-gassing caused by the formaldehyde resin in Weyerhaeuser's Joists for over two months and were forced to vacate their brand new home.

76.     Weyerhaeuser has offered Mr. Pudi and Ms. Chillakuru options to address the problem with the defective Joists, including (a) covering the Joists with a layer of paint; or (b) replacing the Joists with other joists. These purported solutions are inadequate. Experts and

building trade professionals have recommended that Weyerhaeuser's proposed "paint protocol" is not an effective solution. Furthermore, the second option comes with many risks and would require Mr. Pudi and Ms. Chillakuru to incur other consequential and ancillary costs.

77.    Moreover, the presence of the Joists, if not completely removed from the house, will diminish the resale value of Mr. Pudi and Ms. Chillakuru's new home.

78.    The presence of the Joists, even if removed, will necessitate ongoing monitoring to ensure that the home does not have dangerous levels of formaldehyde. Medical monitoring for Mr. Pudi and Ms. Chillakuru is also necessary given their exposure to dangerous and unsafe levels of formaldehyde gases.

79.    Mr. Pudi and Ms. Chillakuru have already incurred, and will continue to incur, lost time and expenses in dealing with the problems caused by the Joists, and have incurred other damages, including loss of enjoyment and use of their home, among other things.

<u>**JURISDICTION AND VENUE**</u>

80.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d). The matter in controversy in this class action exceeds $5,000,000.00 exclusive of interest and costs, and Plaintiffs and members of the Class are citizens of a state other than the state in which Defendant is incorporated and has its primary place of business.

81.    Venue is proper pursuant to 28 U.S.C. §1391(b) because: (a) a substantial part of the events giving rise to this action occurred in this District; and (b) the property that is the subject of this action is located in this District.

82.    As a result of Defendant marketing, distributing, promoting, and selling the Joists throughout Pennsylvania, either directly or indirectly through third parties or related entities,

Defendant obtained the benefits of the laws of Pennsylvania and profited from Pennsylvania commerce.

83.     Defendant conducted systematic and continuous business activities throughout the Commonwealth of Pennsylvania and otherwise intentionally availed itself of the market in Pennsylvania through the promotion, marketing and sale of its products, including the Joists. The Joists have been installed in at least hundreds of homes throughout Pennsylvania.

## WEYERHAEUSER'S MISCONDUCT

I.     **Weyerhaeuser Misrepresented The Joists' Characteristics And Breached Its Warranties To The Class**

84.     Weyerhaeuser's TJI Joists with Flak Jacket Protection are part of its Trus Joist floor system, which, according to Weyerhaeuser, is a result of "[m]ore than 50 years of wood research and technology." Weyerhaeuser has represented that "a survey of builders" determined that "TJI joists were the number one brand in quality, familiarity and usage."

85.     Flak Jacket is a Weyerhaeuser "proprietary, factory-applied coating" that purportedly "enhances the joist's fire resistance."

86.     Weyerhaeuser owns and controls the formula and specifications for the Flak Jacket coating, and at all times oversaw and was responsible for the development and manufacture of the TJI Joists with Flak Jacket Protection.

87.     Since at least December 1, 2016, Weyerhaeuser has coated the Joists with a Flak Jacket coating that includes a formaldehyde-based resin.

88.     Weyerhaeuser has sold or distributed the Joists throughout Pennsylvania and the United States for installation in homes and other structures, including homes that reside families, senior citizens and children.

15

89.     Marketing materials obtained from Weyerhaeuser's own website represent that its Joists "offer the high-performance flooring [consumers] rely on with the fire-resistance that new regulations require," "do[] not require special handling," and are "backed by Weyerhaeuser support."

90.     Weyerhaeuser's sales brochures and marketing literature, that were widely distributed to building professionals who installed the Joists, and that were available to Plaintiffs and the Class at the time of sale, similarly tout the superior characteristics of the Joists.

91.     Plaintiffs and the Class, and their builders, relied on Weyerhaeuser's representations and advertising concerning the Joists when they purchased the Joists.

92.     Weyerhaeuser widely advertises that its Joists carry a lifetime warranty. Building professionals and consumers appropriately and reasonably interpret Weyerhaeuser's warranty and representations to mean that the product should not need to be replaced during the lifetime of a home or other structure in which the Joists are installed.

93.     Weyerhaeuser's lifetime warranty is attached hereto as **Exhibit A**. The warranty guarantees against "manufacturing defects for the lifetime of the structure." The warranty also states that "Weyerhaeuser will pay reasonable cost of labor and material for the repair or replacement of the covered Joists, not to exceed 3 times the original purchase price of the Joist."

94.     Given that the Joists need to be immediately repaired, removed and/or replaced, the Joists have not lived up to Weyerhaeuser's representations and warranties.

## II.     Weyerhaeuser's Joists Are Defective

95.     Because of a defect in the design, formulation, and manufacture of the Joists, the Joists emit excessive levels of noxious and toxic gases. These dangerous gases render the homes

16

and other structures in which the Joists are installed uninhabitable and pose a serious safety risk to those who enter these homes and other structures.

96.    These defects have manifested themselves uniformly in the Joists installed in the homes and other structures of Plaintiffs and the Class.

97.    At present, there are thousands of Class members, including Plaintiffs, whose homes and other structures incorporate Weyerhaeuser's defective Joists and who have observed or otherwise experienced the uniform defects described herein.

98.    Some of the homes and structures at issue have already been subject to testing by builders and customers that evidences the defect with the Joists, as described herein.

99.    As a direct result of the readily observable and uniform defects inherent in the Joists, Weyerhaeuser has halted all production, sales and shipments of the Joists and now refers to the Joists as "temporarily discontinued."

### III.    The Remedies Provided By Weyerhaeuser's Warranty Are Inadequate

100.    Weyerhaeuser's warranty is grossly inadequate considering the uniform serious problem with the Joists and the immediate safety risks they present to humans. Weyerhaeuser's warranty purportedly limits Plaintiffs' and Class members' recovery to the "reasonable cost of labor and material for the repair or replacement of the covered Joists, not to exceed 3 times the original purchase price of the Joist." In fact, the repair, removal and/or replacement of already-installed Joists costs far in excess of three times the purchase price of the Joists alone.

101.    Weyerhaeuser's failure to appropriately address on a Class-wide basis the defects inherent in its Joists, that have foreseeably resulted in the problems described herein, constitutes a breach of its express warranties to Plaintiffs and the Class. Moreover, Weyerhaeuser's affirmative

representations as to the quality of its defective Joists constitute an actionable misrepresentation of material fact.

102.    Weyerhaeuser warranted and advertised to contractors, subcontractors, Plaintiffs, and the Class, the quality of its Joists even though it reasonably should have known that the Joists were defectively designed and manufactured.

103.    As a direct and proximate result of Weyerhaeuser's Joists being installed in the homes and other structures of Plaintiffs and the Class, Plaintiffs and the Class have suffered damages, in that the Joists have emitted and will continue to emit noxious and toxic gases that make people sick and render the homes and other structures uninhabitable.

104.    To the extent that Weyerhaeuser's warranty purports to limit or eliminate certain contractual rights afforded to Plaintiffs (*e.g.,* on the type of recoverable damages or the ability to recover property damages and other types of damages), such limitations are unconscionable and unenforceable under the circumstances.

**IV.    The Remedies Purportedly Offered By Weyerhaeuser are Insufficient**

105.    In a July 18, 2017 press release, Weyerhaeuser admitted the defective nature of the Joists was caused by the Joists' "Flak Jacket coating that included formaldehyde-based resin." In the same press release, Weyerhaeuser asserted that it was "working proactively with its customers to address this situation and will cover the cost to either remediate or replace affected joists." However, its remediation and replacement options are insufficient and will not make Plaintiffs and the Class whole.

106.    For example, with respect to Weyerhaeuser's purported remediation option, Weyerhaeuser has proposed simply applying a paint coating to the Joists, which Weyerhaeuser asserts will bind the formaldehyde and reduce emissions. While Weyerhaeuser maintains that it

has successfully tested this method, there is no proof that this technique is effective in the field; it has not been subjected to long-term testing; and the results of the testing Weyerhaeuser has done have not been made available to the public. Further, this proposed method of remediation (which would be a much cheaper fix by Weyerhaeuser) has already been rejected by professionals in the building trades. Even after submitting to this remediation method, Plaintiffs and Class members may still be exposed to harmful gases emitting from the Joists. Additionally, the value of the homes and other structures of Plaintiffs and the Class will be permanently diminished by the continued presence of the defective Joists.

107.    Likewise, Weyerhaeuser's proposed replacement option also fails to adequately address and cover the numerous complications and ancillary costs involved. For example, Weyerhaeuser has told owners of homes with the defective Joists that they will be responsible for retaining their own engineers to confirm the structural integrity of homes once the Joists are replaced.

108.    Plaintiffs and Class Members deserve full compensation for the delay in their ability to occupy their homes, including, without limitation, reimbursement for the expense and inconvenience of having to deal with this issue, finding alternative living arrangements on short notice, and all of the time and associated expenses.

109.    Class Members who have already moved into homes containing the Joists have been subjected to numerous other harms as a result of the defective Joists, including, without limitation, headaches, stinging and tearing eyes, dizziness, nausea, coughing and wheezing, and asthma-type symptoms.

110.    In addition, formaldehyde is a known carcinogen, meaning it contributes to causing cancer in humans.

## CLASS ACTION ALLEGATIONS

111.     This action has been brought and may be properly maintained as a nationwide class action pursuant to Fed. R. Civ. P. 23, on behalf of the following class:

> All persons and entities who own or who have signed contracts to purchase homes or other structures located in the United States in which Weyerhaeuser TJI Joists with Flak Jacket Protection are or were installed (the "Class"). Excluded from the Class is Defendant and Defendant's legal representatives, assigns and successors.

112.     This action has also been brought and may be properly maintained as a Pennsylvania class action pursuant to Fed. R. Civ. P. 23 on behalf of the Pennsylvania Class defined as follows:

> All persons and entities who own or who have signed contracts to purchase homes or other structures located in the Commonwealth of Pennsylvania in which Weyerhaeuser TJI Joists with Flak Jacket Protection are or were installed (the "Pennsylvania Class"). Excluded from the Class is Defendant and Defendant's legal representatives, assigns and successors.

113.     The Class and Pennsylvania Class are collectively referred to below as the "Classes." Plaintiffs reserve the right to redefine the Classes prior to class certification.

114.     Members of the Classes are so numerous that their individual joinder is impracticable. While the precise number is unknown at this time, upon information and belief, both proposed Classes are comprised of hundreds or thousands of members. The true number of Class members is known by Defendant and discoverable through its books and records.

115.     There are numerous questions of law and fact common to Plaintiffs and the Classes, that predominate over any questions that may affect individual Class members, including, but not limited to:

> a)     whether the Joists are defective;

b)      whether the Joists are subject to emitting formaldehyde-based and other harmful and/or toxic gases, and are not suitable for use as advertised, marketed and warranted;

c)      whether Weyerhaeuser knew or should have known of the defective nature of the Joists prior to putting them into the stream of commerce for purchase by Plaintiffs and the Classes;

d)      whether Weyerhaeuser properly and timely provided notice and advised all affected consumers about the problems with the Joists;

e)      whether Weyerhaeuser owed a duty to Plaintiffs and the Classes to exercise reasonable and ordinary care in the formulation, testing, design, manufacture, warranting, distribution, marketing, and sale of the Joists;

f)      whether Weyerhaeuser breached its duty to Plaintiffs and the Classes by designing, manufacturing, advertising, and selling to Plaintiffs and the Class members defective Joists, and by failing promptly to remove the Joists from the marketplace or take other appropriate remedial action;

g)      whether the Joists will continue to exhibit the defect over time;

h)      whether the Joists will continue to exhibit the defect over time despite proposed remediation remedies such as Weyerhaeuser's proposed "paint protocol";

i)      whether the Joists fail to perform in accordance with the reasonable expectations of ordinary consumers;

j)      whether the Joists fail to perform as advertised, marketed and warranted;

k)      whether Weyerhaeuser breached its express warranties to Plaintiffs and the Classes by advertising, marketing and selling defective Joists to Plaintiffs and the Classes;

21

l)      whether Weyerhaeuser breached its implied warranties to Plaintiffs and the Classes by advertising, marketing and selling Joists that were not of a merchantable quality, and that were not fit for the ordinary purpose for which they were sold;

m)      whether Plaintiffs and the Classes are entitled to compensatory damages, and the amount of such damages for the removal and replacement of the defective Joists;

n)      whether Plaintiffs and the Classes are entitled to consequential and ancillary damages relating to the defective Joists;

o)      whether Plaintiffs and the Classes are entitled to ongoing testing and monitoring of the formaldehyde levels in their homes and of their exposure to formaldehyde;

p)      whether Weyerhaeuser's representations regarding the quality of its Joists, and its omissions and concealment of facts to the contrary regarding the defective Joists, constitute violations of applicable consumer protection laws and other applicable statutes; and

q)      whether Weyerhaeuser should be required to notify all Class members about the defective Joists.

116.    Plaintiffs' claims are typical of the claims of the members of the Classes. As a result of the uniform defects inherent in the Joists' formulation, the defective Joists have caused Plaintiffs and all members of the Classes to suffer damages.

117.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting nationwide, multistate and state law consumer class actions. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Classes they represent, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse or antagonistic to those of the Classes.

118.    Plaintiffs and the members of the Classes have all suffered and will continue to suffer harm and damages as a result of Weyerhaeuser's conduct as described herein. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, the vast majority of Class members likely would not be in a position to litigate their claims individually and would have no effective remedy at law through which to vindicate their claims against Weyerhaeuser and be made whole. Class treatment of predominating common questions of law and fact is also superior to multiple individual actions, in that class treatment would conserve the resources of the courts and the litigants, and will further the efficient adjudication of Class members' claims.

## CAUSES OF ACTION

### COUNT I
### BREACH OF EXPRESS WARRANTY

119.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

120.    Weyerhaeuser marketed and sold its Joists into the stream of commerce with the intent that the Joists would be purchased by contractors, subcontractors and end-users for installation in homes and other structures owned and purchased by Plaintiffs and the Classes.

121.    Prior to filing this lawsuit, Plaintiffs provided written notice to Weyerhaeuser of the breach of warranty.

122.    Weyerhaeuser expressly warranted in writing that its Joists are well-suited as a building material with a useful life matching the lifetime of the structure in which the Joists are installed. For purchasers of the Joists or of homes and other structures with the Joists, these warranties became part of the basis of the bargain and Plaintiffs and the Classes relied upon the representations and warranties.

23

123.    Pursuant to Weyerhaeuser's express warranty, Weyerhaeuser is to pay costs for repair or replacement of the defective Joists. In exchange for these duties and obligations, Weyerhaeuser received payment of the purchase price for the Joists from Plaintiffs and the Classes.

124.    Weyerhaeuser created additional express warranties for the Joists through its sales brochures, catalogs, website and marketing materials. These warranties have full force and effect, notwithstanding any limitations in the "limited warranties" from Weyerhaeuser.

125.    Weyerhaeuser made the express warranties to the ultimate consumers, including Plaintiffs and the Classes.

126.    The limitations and exclusions in Weyerhaeuser's warranties are unconscionable and unenforceable.

127.    The consequential or incidental losses sustained by Plaintiffs and the Classes are within the contemplation of the parties, and therefore should not be prohibited when such bargained for remedy fails of its essential purpose.

128.    Weyerhaeuser's purported "limited warranty" fails of its essential purpose in that it limits recovery to a multiple of the purchase price of the Joists themselves when adequate repair, replacement and/or removal of the Joists will cost far in excess of the limited amount.

129.    Because Weyerhaeuser's warranty fails in its essential purpose, Plaintiffs and the Classes are entitled to recover available damages.

130.    Weyerhaeuser's Joists were defective at the time they were acquired by Plaintiffs and members of the Classes, and they were defective at the time they were acquired by Plaintiffs' builders.

131.    Weyerhaeuser failed to perform as required under its purported warranties and breached said contracts and agreements by providing Plaintiffs and the Classes with Joists that

were defective and unfit for their intended use and did not perform as promised, and failed to appropriately replace the Joists or otherwise provide relief.

132.    The Joists fall well short of the lifetime guarantee as their defective nature is evident immediately upon installation of the Joists or occupation of the structure.

133.    Weyerhaeuser breached its express warranties to Plaintiffs and the Classes by designing, manufacturing, marketing and selling Joists that were defective and not fit for their intended use as durable and long-term home building products. As detailed herein, the Joists did not perform as expressly promised and were fraught with uniform defects.

134.    Weyerhaeuser knew that its Joists were defective, yet continued to represent that they were free of defects. Plaintiffs and members of the Classes had no ability to detect the defect nor received notice thereof, and did not receive notice on a timely basis. Based on facts within its control, Weyerhaeuser knew or should have known of the defective nature of the Joists long before its July 18, 2017 press release.

135.    Plaintiffs and the Classes have relied on Weyerhaeuser's express warranties to their detriment.

136.    Weyerhaeuser's warranty coverage is inadequate to cover all of the costs of repairing, replacing and/or removing the defective Joists from the homes and structures of Plaintiffs and the Classes, and does not compensate Plaintiff and the Classes for any damages to their underlying homes and structures caused by the defective Joists, for their consequential and ancillary damages, and for the diminution in the value of their homes and structures.

137.    Weyerhaeuser is on actual notice of its breaches, as Weyerhaeuser noted in its own press release that the Joists are defective. In addition, builders and consumers across the United

States have put Weyerhaeuser on notice of its breaches. Furthermore, Plaintiffs provided notice to Weyerhaeuser of its breaches prior to filing this lawsuit.

138.    As a result of Weyerhaeuser's breach of its express warranties, Plaintiffs and the Classes have suffered actual damages, in that they have purchased and installed in their homes and other structures Joists that are defective and not at all suitable for their intended purpose. These defects have caused and will continue to cause Plaintiffs and the Classes to expend substantial resources repairing and/or replacing their Joists and to address any collateral damages to their underlying homes and structures proximately caused by the defective Joists.

139.    Plaintiffs and the Classes reserve their right to seek all damages available by statute or law.

<u>**COUNT II**</u>
<u>**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**</u>

140.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

141.    Weyerhaeuser designed, manufactured, and sold the Joists knowing that they would be used in constructing consumers' homes.

142.    Weyerhaeuser was a merchant of the Joists and marketed, promoted, and sold the Joists to the consuming public.

143.    Weyerhaeuser expected the consuming public, including Plaintiffs, to use the Joists to construct their homes; and such use was reasonably foreseeable. The Joists sold by Weyerhaeuser were not merchantable at the time Weyerhaeuser sold them.

144.    Weyerhaeuser warranted to the Plaintiffs that the Joists were of a quality that would pass without objection in the trade and were at least fit for the ordinary purposes for which such goods were used, and in all other respects were of merchantable quality.

26

145.    Plaintiffs relied on that warranty.

146.    Weyerhaeuser breached its implied warranty of merchantability because the Joists were not of merchantable quality and were unfit for the ordinary purposes for which they were designed and were used.

147.    Prior to filing suit, Plaintiffs notified Weyerhaeuser of the defective nature of its Joists and of its breach of the implied warranty of merchantability within a reasonable time of its discovery.

148.    Given the significance of the Joists to the structure of Plaintiffs' home and the homes of Class members – supporting the floors – any limitation of remedies claimed by Weyerhaeuser must fail of its essential purpose in that significant damage to property will occur and the replacement of the Joists cannot be accomplished without considerable consequential cost and expense.

149.    As a result of Weyerhaeuser's breach of its implied warranties, Plaintiffs and the Classes have suffered actual damages, in that they have purchased and installed in their homes and other structures joists that are defective and not at all suitable for their intended purpose. These defects have caused and will continue to cause Plaintiffs and the Classes to expend substantial resources repairing, removing and/or replacing their Joists and addressing any collateral damages to their underlying homes and structures proximately caused by the defective Joists.

150.    Plaintiffs and the Classes reserve their right to seek all damages available by statute or law.

## COUNT III
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
## (15 U.S.C. § 2301, *et seq.*)

151.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

152.    The Joists are a consumer product as defined in 15 U.S.C. § 2301(1).

153.    Weyerhaeuser is a supplier and a warrantor as defined in 15 U.S.C. § 2301(4) & (5).

154.    The warranty that came with the products constitutes a "written warranty" under 15 U.S.C. § 2301(6)(A) and/or (B).

155.    Plaintiffs and the Class members are "consumers" as defined in 15 U.S.C. § 2301(3). They are consumers because: (a) they are buyers of a consumer product; (b) they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranty; and (c) they are entitled to enforce a written warranty.

156.    Pursuant to 15 U.S.C. § 2310(e), although Weyerhaeuser is on written notice of the problems with the Joists and Plaintiffs' claims, Plaintiffs and the Classes are entitled to bring this class action and are not required to give Weyerhaeuser notice and opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

157.    Weyerhaeuser is liable to Plaintiffs and the Class members pursuant to 15 U.S.C. § 2310(d)(1) because it breached its written warranties as set forth above.

158.    In connection with its sales of the Joists, Weyerhaeuser gave an implied warranty as defined in 15 U.S.C. § 2301(7); namely, the implied warranty of merchantability. As a part of the implied warranty of merchantability, Weyerhaeuser warranted that the Joists, among other

things, were fit for their ordinary purpose as a safe building product that complies with all applicable laws and regulations. Weyerhaeuser is liable to Plaintiffs and the Classes pursuant to 15 U.S.C. § 2310(d)(1) because it breached the implied warranty of merchantability as set forth herein.

159.    Pursuant to 15 U.S.C. § 2310(d)(1), Plaintiffs and the Class members are entitled to recover the following damages proximately caused by Weyerhaeuser's breaches of its written warranties and the implied warranty of merchantability: (a) direct economic damages at the point of sale in the amount of the difference in value between the value of the Joists as warranted (the full purchase price) and the value of the Joists as delivered ($0); and (b) consequential economic damages at the point of repair in the form of the cost of repair, replacement and/or removal of the Joists.

160.    In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by Plaintiffs and the Class members in connection with the commencement and prosecution of this action.

## COUNT IV
## STRICT LIABILITY – DESIGN DEFECT

161.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

162.    Weyerhaeuser designed its Joists to be used and installed in the Plaintiffs' and Class members' homes and other structures.

163.    The design of Weyerhaeuser's Joists, including the formulation of the coating, was defective.

164.    Because of such design defects, the Joists were and are unreasonably dangerous to the consuming public, including Plaintiffs and members of the Classes. The Joists posed a substantial likelihood of harm at the time they were sold.

165.    The defect in Weyerhaeuser's design of the Joists existed at the time the Joists were sold and/or when the Joists left Weyerhaeuser's possession or control.

166.    The risks inherent in the design of Weyerhaeuser's Joists outweigh the benefits of their design.

167.    Feasible alternatives existed to make Weyerhaeuser's Joists safer for their intended use at the time of their design.

168.    The Joists were expected to be and were installed in consumers' homes and other structures, including Plaintiffs' homes, without substantial change in their condition from the time of their manufacture or sale.

169.    Weyerhaeuser is strictly liable for the injuries that the Joists have caused and will cause to Plaintiffs and members of the Classes.

170.    As a proximate result of Weyerhaeuser's defective design of the Joists, Plaintiffs and the Classes have incurred and will incur damages in an amount to be proven at trial.

## COUNT V
## STRICT LIABILITY – MANUFACTURING DEFECT

171.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

172.    Weyerhaeuser manufactured its Joists to be used and installed in the Plaintiffs' and Class members' homes and other structures

173.    When the Joists left Weyerhaeuser's control, they deviated in a material way from their design and/or performance standards. As a result, the Joists were unreasonably dangerous to the consuming public, including the Plaintiffs and members of the Classes.

174.    The Joists were defectively manufactured and posed a substantial likelihood of harm at the time they were sold and/or when the Joists left Weyerhaeuser's possession or control.

175.    The Joists were expected to be and were installed in consumers' homes and other structures, including Plaintiffs' homes, without substantial change in their condition from the time of their manufacture or sale.

176.    Weyerhaeuser is strictly liable for the injuries that the Joists have caused and will cause to Plaintiffs and members of the Classes.

177.    As a proximate result of Weyerhaeuser's defective manufacture of the Joists, Plaintiffs have incurred and will incur damages in an amount to be proven at trial.

### COUNT VI
### STRICT LIABILITY – FAILURE TO WARN

178.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

179.    Weyerhaeuser designed and manufactured the Joists used and installed in Plaintiffs' and Class members' homes and other structures.

180.    When Plaintiffs purchased the home containing the Joists, they were not aware of the dangerous and destructive nature of the Joists. Weyerhaeuser knew or had reason to know that consumers would not realize the dangerous condition of the Joists.

181.    Weyerhaeuser did not provide, and the Joists did not contain, adequate warnings and as a result, the Joists were unreasonably dangerous to the consuming public, including Plaintiffs and members of the Classes.

31

182.    The defect in the Joists, including the lack of warnings, existed at the time the Joists were sold and/or when the Joists left Weyerhaeuser's possession or control.

183.    The Joists were expected to be and were installed in consumers' homes and other structures, including the homes of Plaintiffs and members of the Classes, without substantial change in their condition from the time of their manufacture or sale.

184.    Weyerhaeuser is strictly liable for the injuries that its defective Joists and its lack of warnings have caused Plaintiffs and members of the Classes. Such harm would not have been suffered if Weyerhaeuser had provided adequate warnings or instructions.

185.    Weyerhaeuser is strictly liable for the injuries that the Joists have caused and will cause to Plaintiffs and members of the Classes.

186.    As a proximate result of Weyerhaeuser's failure to give adequate warnings or instructions, Plaintiffs and members of the Class have incurred and will incur damages in an amount to be proven at trial.

## COUNT VII
## NEGLIGENCE

187.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

188.    Weyerhaeuser designed, developed, formulated, tested, manufactured and sold Weyerhaeuser's Joists for use and installation in homes and other structures.

189.    Weyerhaeuser was negligent in that it failed to use reasonable care when it designed, developed, formulated, tested, manufactured and sold its Joists.

190.    Weyerhaeuser's Joists are unreasonably dangerous when used in homes and other structures.

191.    Weyerhaeuser owed a duty to the consuming public to design, develop, formulate, test and manufacture a product reasonably free of defect.  Weyerhaeuser further had a duty not to put defective and dangerous products such as its Joists on the market.

192.    At the time Weyerhaeuser was selling its Joists, Weyerhaeuser was aware, or reasonably should have been aware, of the foreseeable risks associated with the use of its Joists.

193.    Weyerhaeuser was negligent and breached its duty to the consuming public, including Plaintiffs and Class members, by designing, developing, formulating, testing, manufacturing and selling Weyerhaeuser's Joists that, under ordinary use in consumers' homes, emit noxious gases.

194.    The injuries sustained by Plaintiffs and members of the Classes could have been reasonably foreseen by Weyerhaeuser.

195.    As a direct and proximate result of Weyerhaeuser's negligent acts and/or omissions, Plaintiffs and members of the Classes have incurred and will incur damages in an amount to be proven at trial.

## COUNT VIII
## NEGLIGENT FAILURE TO WARN

196.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

197.    Weyerhaeuser owed a duty to the consuming public to design, develop, formulate, test and manufacture a product reasonably free of defect.

198.    Weyerhaeuser had a duty to disclose to the consuming public the foreseeable risks associated with the use of its Joists.

199.    At the time Weyerhaeuser was selling the Joists, Weyerhaeuser was aware, or reasonably should have been aware, of the foreseeable risks associated with the use of its Joists.

33

200.    Weyerhaeuser was negligent in that it knew or, by the exercise of reasonable care, should have known that Weyerhaeuser's Joists under ordinary use in homes and other structures, might be harmful or injurious to the consuming public, including the Plaintiffs and members of the Classes, but failed to use reasonable care to warn Plaintiffs and members of the Classes and the consuming public of the potentially harmful and injurious effects in the manner that a reasonable person would under the same or similar circumstances.

201.    Weyerhaeuser failed to exercise reasonable care and give adequate warnings or instructions to consumers about the reasonably foreseeable dangers that could result from using Weyerhaeuser's Joists under reasonably foreseeable conditions.

202.    Consumers occupying and/or purchasing homes were not aware of the dangerous nature of the Joists.

203.    When the Plaintiffs bought the home containing the Joists, they were not aware of the dangerous and destructive nature of the Joists and Weyerhaeuser knew or had reason to know that those consumers would not realize the dangerous condition of the Joists.

204.    Due to Weyerhaeuser's failure to provide consumers with adequate warnings or instruction about the dangerous nature of the Joists, Plaintiffs and members of the Classes have been and will be harmed. Such harm would not have been suffered if Weyerhaeuser provided adequate warnings or instructions.

205.    As a direct and proximate result of Weyerhaeuser's negligent acts and/or omissions, Plaintiffs and members of the Classes have incurred and will incur damages in an amount to be proven at trial.

<u>**COUNT IX**</u>
<u>**VIOLATION OF THE PENNSYLVANIA**</u>
<u>**UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**</u>
<u>**(73 P.S. § 201-1, *et seq.*)**</u>

206.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

207.    Plaintiffs purchased their Joists primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

208.    All of the acts complained of herein were perpetrated by Weyerhaeuser in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

209.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") prohibits unfair or deceptive acts or practices, including, but not limited to: (i) "Representing that goods or services have…characteristics … that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;:" (iii) "Advertising goods or services with intent not to sell them as advertised;" (iv) "Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made;" and (v) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

210.    Weyerhaeuser engaged in unlawful trade practices, including representing that the Joists have characteristics which they do not have; representing that the Joists are of a particular standard and quality when they are not; advertising the Joists with the intent not to sell them as advertised; failing to comply with its warranties; and engaging in other fraudulent or deceptive conduct, creating a likelihood of confusion or of misunderstanding.

211.    Weyerhaeuser's deceptive acts or practices were intended to induce, and did induce, contractors, subcontractors, Plaintiffs and members of the Pennsylvania Class to purchase the Joists.

212.    Weyerhaeuser manufactured, merchandised and sold the Joists knowingly concealing and/or omitting that they contained the design, manufacturing, materials and/or workmanship defects described in detail above.

213.    Weyerhaeuser failed to disclose to Plaintiffs and members of the Pennsylvania Class and/or actively concealed from them that the Joists were and are defective.

214.    Weyerhaeuser's acts constitute unfair and deceptive business practices in violation of the UTPCPL.

215.    Weyerhaeuser intentionally and knowingly misrepresented material facts regarding the Joists with an intent to mislead Plaintiffs and the Pennsylvania Class.

216.    Weyerhaeuser knew or should have known that its conduct violated the UTPCPL.

217.    As alleged above, Weyerhaeuser made material statements about the Joists that were either false or misleading.

218.    Weyerhaeuser owed Plaintiffs and the Pennsylvania Class a duty to disclose the true nature of the Joists.

219.    Weyerhaeuser' concealment of the true characteristics of the Joists was material to Plaintiffs and the Pennsylvania Class.

220.    Plaintiffs and the Pennsylvania Class suffered ascertainable loss caused by Weyerhaeuser's misrepresentations and its concealment of and failure to disclose material information.

221.    Weyerhaeuser had an ongoing duty to consumers to refrain from unfair and deceptive acts or practices under the UTPCPL.

222.    Weyerhaeuser's violations present a continuing risk to Plaintiffs as well as to the general public. Weyerhaeuser's unlawful acts and practices complained of herein affect the public interest.

223.    Weyerhaeuser's misrepresentation caused and/or will cause Plaintiffs and members of the Pennsylvania Class to be damaged.

224.    Plaintiffs, members of the Pennsylvania Class, contractors, subcontractors and members of the public were deceived by and relied on Weyerhaeuser's affirmative misrepresentations and failures to disclose, including, but not limited to, representations about the Joists' quality and warranty benefits.

225.    Weyerhaeuser engaged in such conduct for the purpose of unfairly and unconscionably maximizing revenue from Plaintiffs and members of the Pennsylvania Class.

226.    As a direct and proximate result of Weyerhaeuser's violations of the UTPCPL, Plaintiffs and the Pennsylvania Cass have suffered injury-in-fact and/or actual damage.

227.    Weyerhaeuser is liable to Plaintiffs and the Pennsylvania Class for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a). Plaintiffs and the Pennsylvania Class are also entitled to an award of punitive damages given that Weyerhaeuser's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT X
## UNJUST ENRICHMENT

228.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

229.    Substantial benefits have been conferred on Weyerhaeuser by Plaintiffs and the Classes by purchasing the Joists, and Weyerhaeuser has knowingly and willingly accepted and enjoyed these benefits.

230.    Weyerhaeuser either knew or should have known that the payments rendered by Plaintiffs and the Classes were given and received with the expectation that the Joists would perform as represented and warranted. For Weyerhaeuser to retain the benefit of the payments under these circumstances is inequitable.

231.    Weyerhaeuser's acceptance and retention of these benefits under the circumstances make it inequitable for Weyerhaeuser to retain the benefit without payment of the value to the Plaintiffs and the Classes.

232.    Plaintiffs and the Classes are entitled to recover from Weyerhaeuser all amounts wrongfully collected and improperly retained by Weyerhaeuser, plus interest thereon.

233.    As a direct and proximate result of Weyerhaeuser's wrongful conduct and unjust enrichment, Plaintiffs and the Classes are entitled to an accounting, restitution from and institution of a constructive trust disgorging all profits, benefits and other compensation obtained by Weyerhaeuser, plus attorneys' fees, costs and interest thereon.

## COUNT XI
## DECLARATORY JUDGMENT ACT
### (28 U.S.C. § 2201, et seq.)

234.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

235.    Declaratory relief is intended to minimize "the danger of avoidable loss and unnecessary accrual of damages." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2751 (3d ed. 1998).

236.   There is an actual controversy between Weyerhaeuser and Plaintiffs concerning:

  a)   whether the Joists are defectively designed;

  b)   whether Weyerhaeuser knew or should have known of the defects; and

  c)   whether Weyerhaeuser failed to warn against the potential unsuitability of

its defectively designed and manufactured Joists.

237.   Pursuant to 28 U.S.C. § 2201, the Court may "declare the rights and legal relations

of any interested party seeking such declaration, whether or not further relief is or could be sought."

238.   Plaintiffs seek a declaration that the Joists are defective in their design,

workmanship, materials, and labeling, as alleged herein. The defective nature of the Joists is

material and requires disclosure to all persons who own the Joists or have entered into agreements

or contracts to purchase homes containing the Joists.

239.   The declaratory relief requested herein will generate common answers that will

settle the controversy related to the alleged defective design, workmanship, materials, and labeling

of the Joists and the reasons for their failure. There is an economy to resolving these issues as they

have the potential to eliminate the need for continued and repeated litigation.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Classes, respectfully

request that the Court grant the following relief:

A.   Enter an Order certifying the proposed Classes, appointing Plaintiffs as Class

Representatives, and appointing the undersigned counsel as Class Counsel;

B.   Declare that Weyerhaeuser must notify all Class members of the problems with the

Joists;

C.      Enter an Order enjoining Weyerhaeuser from further deceptive advertising, marketing, distribution, and sales practices with respect to the Joists, and requiring Weyerhaeuser to remove and replace Plaintiffs' and Class members' Joists with suitable alternative joists of Plaintiffs' and Class members' choosing;

D.      Enter an award to Plaintiffs and the Class that includes all actual, compensatory, consequential, ancillary, statutory, exemplary, punitive, or other damages as allowed by Pennsylvania law or other law, and statutory damages and penalties, including interest thereon, in an amount to be proven at trial;

E.      Declare that Weyerhaeuser must account for and disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale of its Joists, or order Weyerhaeuser to make full restitution to Plaintiffs and members of the Classes;

F.      Award pre-judgment and post-judgment interest at the maximum rate allowable by law;

G.      Award reasonable attorneys' fees and reimbursement of costs incurred by Plaintiffs and their counsel in connection with this action; and

H.      Award such other and further injunctive relief, including ongoing monitoring of Class members homes, and medical monitoring, as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiffs, on behalf of themselves and the members of the proposed Classes, hereby demand trial by jury on all issues so triable.

Dated: September 1, 2017

Shanon J. Carson (PA No. 85957)
Lawrence Deutsch (PA No. 45653)
Jacob M. Polakoff (PA No. 204124)
BERGER & MONTAGUE, P.C.
1622 Locust Street

40

Philadelphia, PA  19103
Telephone: (215) 875-4656
Facsimile:  (215) 875-4604
Email:  scarson@bm.net
            ldeutsch@bm.net
            jpolakoff@bm.net

E. Michelle Drake
Joseph C. Hashmall
BERGER & MONTAGUE, P.C.
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 594-5933
Facsimile:  (612) 584-4470
Email:  emdrake@bm.net
            jhashmall@bm.net

***Counsel for Plaintiffs and the Proposed Classes***

# Exhibit A

# LIMITED LIFETIME WARRANTY
# Trus Joist® TJI® Joist

## What Is Covered?

Weyerhaeuser Trus Joist® TJI® or Silent Floor® joists (Joists), when properly stored, installed as floor or roof joists in a structure and maintained per Weyerhaeuser's published instructions, is warranted by Weyerhaeuser NR Company (Weyerhaeuser) for adequacy of design values as published by Weyerhaeuser and against delamination or manufacturing defects for the lifetime of the structure. This limited warranty is transferable.

## Definition of Covered Conditions

Delamination is defined as an extensive separation of strands within the OSB web, or extensive separation of the LVL flange material veneers. Minor localized edge checking or loose strands on the surface of the OSB web do not constitute delamination, nor does minor edge separation of the LVL veneers. This warranty does not cover the performance of Joists outside the U.S. and Canada, nor delamination, separation, perceived inadequacy of design, or perceived defects due to:

- Prolonged exposure to water after completion of construction or long construction delays; fire, floods, fungal growth, natural disaster, or any other cause beyond Weyerhaeuser's control.

- Defects in the structure due to construction, installation, or manufactured sub-assembly.

- Damage to the product prior to, during, or after installation.

- Noncompliance with installation instructions, applicable building code or generally accepted construction practices.

- Any alterations to the Joists after the original installation.

- Mold, fungal decay or rot; termites or termite damage.

- Pressure or topical treatment not approved by Weyerhaeuser.

Note: Like any wood product, all wood-based joists may be at risk for fungal decay or rot when exposed to repeated wetting or high-moisture environments, particularly if not properly ventilated or subjected to water leaks. For this reason, building construction, design and use features must ensure that the Joists are protected from such exposure by accepted construction practices and adherence to applicable building codes.

## What Weyerhaeuser Will Do

For delamination, strand or component separation, inadequacy of design values (as published) or manufacturing defect covered by this warranty, Weyerhaeuser will pay reasonable cost of labor and material for the repair or replacement of the covered Joists, not to exceed 3 times the original purchase price of the Joist.

## What You Must Do

You must notify Weyerhaeuser in writing of any claim under this warranty within 30 days of the discovery of covered condition at the following address:

Weyerhaeuser Product Assurance Group
33663 Weyerhaeuser Way South
Federal Way, Washington 98003
253.924.5214 • 253.924.4999 (fax)

Upon request, you must provide Weyerhaeuser with reasonable proof of product identification in the form of a sample, a photograph of the identifying stamp, or dated receipt. A Weyerhaeuser representative must be given the opportunity to observe or inspect the affected product prior to any alteration, change or repair.

## Incidental or Consequential Damages

Weyerhaeuser's sole responsibility is as set forth in this warranty and Weyerhaeuser will not be responsible for incidental, indirect or consequential damages. Some states and provinces do not allow the exclusion or limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to you.

## State Law Rights

This warranty gives you specific legal rights, and you may also have other rights which vary from state to state and province to province.



Reorder TJ-1006 February 2015     ⚠ Weyerhaeuser, Trus Joist, TJI and Silent Floor are registered trademarks of Weyerhaeuser NR. © 2015 Weyerhaeuser NR Company. All rights reserved.