# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| KRISTINA KIPP, et al. | : | CIVIL ACTION |
|---|---|---|
| v. | : | No. 17-3958 |
| WEYERHAUSER COMPANY | : | |

**MEMORANDUM**

**Juan R. Sánchez, C.J.**                                                                              **December 14, 2018**

Named Plaintiffs Kristina Kipp, Vincent Distefano, Carol Eberl, Anjani Tripathi, Chhavi Chaturvedi, Srikanth Kalvakotavenkata, Shalini Marka, David Lai, Rahul Pudi, and Anusha Chillakuru (collectively, Named Plaintiffs) bring this products liability class action on behalf of themselves and others similarly situated against Defendant Weyerhaeuser Company (Weyerhaeuser) for damages sustained after Weyerhaeuser-produced construction materials emitted unsafe levels of noxious formaldehyde gas, causing physical harm to Named Plaintiffs and their children and rendering their homes uninhabitable. In response, Weyerhaeuser filed a motion to compel arbitration, seeking to enforce arbitration provisions contained in agreements between Named Plaintiffs and the builder of their homes, Pulte Homes (Pulte), even though Weyerhaeuser is not party to those agreements. Because the Court finds there is no agreement between Named Plaintiffs and Weyerhaeuser requiring arbitration, Weyerhaeuser's motion to compel arbitration will be denied.

**FACTS**

In 2017, Named Plaintiffs purchased homes in Chester Springs, Pennsylvania. The homes allegedly contained formaldehyde-contaminated joists, materials used to support floors, manufactured by Weyerhaeuser. At oral argument, Weyerhaeuser's counsel conceded that the joists at-issue were sold by Weyerhaeuser to dealers and distributors, who, in turn, sold them to

home builders for use in homes eventually sold to consumers. Counsel also conceded that Named Plaintiffs did not have any interaction with Weyerhaeuser nor did they pay any money to Weyerhaeuser.

As part of the home purchase, Named Plaintiffs each entered into identical Home Purchase Agreements (HPAs) with Pulte. Each HPA defines the "BUYER" as the Named Plaintiff, and the "SELLER" as "Pulte Homes of PA, Limited Partnership." Mot. to Compel Ex. A (Doc. 26) at 30.[1] Each HPA also contains an arbitration provision which, in pertinent part, provides:

> ARBITRATION. BY ENTERING INTO THIS AGREEMENT, **BUYER AND SELLER** AGREE THAT ANY CONTROVERSY, CLAIM OR DISPUTE, ARISING OUT OF OR RELATED TO THIS AGREEMENT OR BUYER'S PURCHASE OF THE PROPERTY OR ANY RIGHTS AND OBLIGATIONS **BETWEEN THE PARTIES** WILL BE RESOLVED BY BINDING ARBITRATION PURSUANT TO THE FEDERAL ARBITRATION ACT (TITLE 9 OF THE UNITED STATES CODE). . . . THIS ARBITRATION SHALL APPLY TO ALL CLAIMS BETWEEN **BUYER AND SELLER,** INCLUDING THOSE FOR DEATH, PERSONAL INJURY, PROPERTY DAMAGE, DEFECTIVE DESIGN OR CONSTRUCTION, MISREPRESENTATION OR FRAUD.
>
> […]
>
> **BUYER** AGREES THAT THE OBLIGATION SET FORTH IN THIS SECTION SHALL SURVIVE CLOSING OR THE TERMINATION OF THIS AGREEMENT FOR ANY REASON. **SELLER MAY, AT SELLER'S OPTION, INCLUDE SELLER'S SUBCONTRACTORS AND SUPPLIERS AND OTHER PARTIES IN THE ARBITRATION**.

Mot. to Compel Ex. A at 41 (emphasis added).

Each Named Plaintiff also received a limited warranty from Pulte as part of their purchase. The terms of the limited warranty apply "only to Covered Defects" which are defined as "defects in material and workmanship that are either part of the structure or are elements of the home as

---

[1] The Court's pinpoint references are to ECF page numbers, and not the document's internal pagination.

supplied by the Builder at the date of closing." Mot. to Compel Ex. G (Doc. 26-1), at 46. The limited warranty further limits its coverage depending on the type of problem identified. Structural elements are defective if "there is actual physical damage that diminishes the ability of the Structural Element to perform its load-bearing function such that the home is unsafe." *Id.* Similar to the HPAs, the limited warranties feature mandatory arbitration procedures for "any dispute concerning [the] home or this Warranty, whether based on statute, in tort, contract, or other applicable law," and allow for either party to join Pulte's suppliers in such an arbitration. *Id.* at 52.

Upon moving into their new homes (or while doing additional work on the home), Named Plaintiffs noticed a strong odor, most prominently in their basements, and they and/or their young children began experiencing physical symptoms consistent with exposure to elevated formaldehyde levels, including red, tearing, irritated, burning, itchy, tingling, and/or dry eyes; blurry vision; respiratory distress; headaches; and dizziness. In late-July 2017, the builder of the homes notified Named Plaintiffs that their homes may contain defective joists, and Named Plaintiffs thereafter vacated their homes. Testing in all of the homes confirmed the presence of excessive levels of formaldehyde, even on levels of the home above the basement.

On September 1, 2017, Named Plaintiffs filed this lawsuit on their own behalf and on behalf of two separate classes of home purchasers asserting various products liability claims sounding in contract and tort. On March 26, 2018, Weyerhaeuser filed the instant motion to compel arbitration, which Named Plaintiffs oppose. On August 21, 2018, the Court stayed this matter so that the parties could attempt to resolve this matter without further judicial intervention. Those efforts having failed, the Court lifted the stay, entered a revised Case Management Order on November 19, 2018, and held oral argument on the motion to compel on December 6, 2018.

**DISCUSSION**

Where "it is apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under [the Federal Rule of Civil Procedure] 12(b)(6) standard without discovery's delay." *See Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 776 (3d Cir. 2013); *Brown v. Sklar-Markind*, No. 14-0266, 2014 WL 5803135, at *6 (W.D. Pa. Nov. 7, 2014) (collecting cases where district courts have relied on the motion to dismiss standard where there is no dispute the parties entered into arbitration agreements). As there is no dispute that Named Plaintiffs executed agreements with Pulte that contained arbitration provisions, Mot. Compl Ex. A at 41, Ex. G at 52, or that the copies of those agreements attached to Weyerhaeuser's motion are authentic, and, as both sides conceded at oral argument, there are no factual disputes discovery may help resolve, Weyerhaeuser's motion is appropriately decided pursuant to the Rule 12(b)(6) standard.

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts pleaded "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. In evaluating a Rule 12(b)(6) motion, a court first must separate the legal and factual elements of the plaintiff's claims. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id*. at 210-11. The court must then "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id*. at 211

(quoting *Iqbal*, 556 U.S. at 679). Affirmative defenses that are apparent from the face of the complaint may be raised by means of a 12(b)(6) motion. *See Rycocline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997).

Weyerhaeuser argues the HPAs and limited warranties contain enforceable arbitration provisions covering the claims in Named Plaintiffs' Complaint, and invokes the doctrine of equitable estoppel, which it concedes is essential to its right to relief because it is not party to the HPAs or limited warranties. Named Plaintiffs oppose each of these arguments. They argue that, because Weyerhaeuser is not a "Seller" as that term is defined under the HPA, or a warrantor under the limited warranty, there is no contractual basis to compel them to arbitrate their claims against Weyerhaeuser. Named Plaintiffs also contest the scope of the arbitration agreement and object to the application of equitable estoppel. As equitable estoppel is dispositive of Weyerhaeuser's ability to enforce the agreement and the Court finds it does not apply here for the reasons explained below, the Court declines to address the parties' disputes as to the enforceability of the arbitration provisions, or their scope.

A party seeking to compel arbitration must show: "(1) an enforceable agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement." *MacDonald v. Unisys Corp.*, 951 F. Supp. 2d 729, 734 (E.D. Pa. 2013) (quoting *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009)). Ordinarily, there is a strong presumption favoring arbitration, but that presumption is inapplicable when determining whether there is a valid arbitration agreement between the parties. *Id.*

"If a party has not agreed to arbitrate, [then] the courts have no authority to mandate that he do so." *Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999); *see also Alexander v. Raymours Furniture Co., Inc.*, No. 13-5387, 2014 WL 3952944, at *3 (E.D. Pa. Aug.

5

13, 2014). A non-signatory to an arbitration agreement may bind a signatory only when "traditional principles of state law allow a contract to be enforced by or against nonparties," including "third-party beneficiary theories [such as] waiver and [equitable] estoppel." *Torres v. CleanNet U.S.A., Inc.*, 90 F. Supp. 3d 369, 379 (E.D. Pa. 2015) (quoting *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009)). Equitable estoppel, which Weyerhaeuser invokes here, allows a non-signatory to bind a signatory where the non-signatory establishes: "(1) a close relationship between the entities involved; and (2) the claims against it are intimately founded in and intertwined with the underlying contractual obligations." *Colon v. Conchetta, Inc.*, No. 17-0659, 2017 WL 2572517, at *5 (June 14, 2017) (citing *Torres*, 90 F. Supp. 3d at 379); *see also E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 195 (3d Cir. 1995). This test is "essentially the same" as the one employed by Pennsylvania courts. *White v. Sunoco, Inc.*, 870 F.3d 257, 263 n.5 (3d Cir. 2017) (citing *Elwyn v. DeLuca*, 48 A.3d 457, 463 (Pa. Super. 2012)).

Weyerhaeuser's argument fails because it cannot establish a "close relationship." Weyerhaeuser contends that its relationship is "sufficiently close" because it was foreseeable that it, a supplier of construction materials, who sold those materials to distributers, who then sold them to builders, who then sold homes containing those materials to homeowners, "*might*" become involved in a dispute with those homeowners. Reply 5 (emphasis added); *see also* Mot. to Compel at 17. In support of its foreseeability argument, Weyerhaeuser relies on two cases: *Booth v. BMO Harris Bank, N.A.*, No. 13-5968, 2014 WL 3952945 (E.D. Pa. Aug. 11, 2014) and *Moss v. BMO Harris Bank, N.A.*, 24 F. Supp. 3d 281 (E.D.N.Y. 2014).[2] Mot. To Compel at 17 (citing *Moss*);

---

[2] Weyerhaeuser also cites two state court decisions—one from the Court of Common Pleas of Philadelphia County and the other from the New Jersey Superior Court—for the general proposition that courts "routinely" compel arbitration where the arbitration clause only references the agreement's signatories. Mot. to Comp. 18 (citing *Wellington v. Westrum Dev. Co.*, 23 Pa. D. & C. 5th 353 (C.C.P. 2011) and *Bruno v. Mark MaGrann Assocs., Inc.*, 909 A.2d 768 (N.J. Super.

Reply 5 (citing *Booth* and *Moss*). In both cases, plaintiffs brought claims against banks for facilitating usurious payday loans. The banks sought to arbitrate based on provisions in the plaintiffs' agreements with the payday lenders to which the banks were not parties. Both Courts found that the banks' roles in processing the loans were sufficiently close to the transaction to invoke equitable estoppel based on the specific language of the lending agreements: In *Booth*, which concerned three different agreements, the Court's decision turned on arbitration provisions which included the payday lender's "agents," "servicers," "affiliated entities," and "servicing and collection representatives and agents."[3] 2014 WL 3952945, at *5-6; and the agreements in *Moss* contained similar language obligating the plaintiff to arbitrate disputes with the lenders' "agents

---

2006)). Although the frequency with which courts grant the type of relief Weyerhaeuser seeks is immaterial, a court's power to compel a signatory to an arbitration agreement to arbitrate with a non-signatory is clear. *See Dupont*, 269 F.3d at 199-200; *see also Arthur Andersen*, 556 U.S. at 631 (noting "traditional principles of state law allow a contract to be enforced by or against nonparties to the contract…").

[3] The three arbitration provisions were as follows: First, the "One-Click Cash agreement" stated that, "if any dispute arises that We cannot resolve to your satisfaction, You and We hereby agree that we shall arbitrate that dispute in accordance with the terms of this Arbitration Provision." 2014 WL 3952945, at *2. The terms "We" and "Us" were defined as "SFS, Inc. dba OneClickCash and its directors, officers, employees, authorized representatives, agents and successors in interest acting within the scope of their authority." *Id.* "[D]ispute" is also defined to include "all claims asserted by You individually against Us, and/or any of our agents, consultants, or servicers and/or any of their employees, directors, officers, shareholders, managers, members, parents, subsidiaries, or any affiliated entities (hereinafter collectively referred to as 'related third parties.')." *Id.* Second, the "My Cash agreement" defined "dispute" to include "all claims asserted by You individually against Us and/or any of Our employees, agents, directors, officers, shareholders, governors, managers, parents company or affiliated entities (hereinafter collectively referred to as 'related third parties')." *Id.* And third, the "Plain Green agreement" provides "You and we…agree that any Dispute…will be resolved by Arbitration," and states "the terms 'we,' 'our,' and 'us' mean Lender, Lender's affiliated companies, the Tribe, Lender's servicing and collection representatives and agent, and each of their respective agents, representatives, employees, officers, directors, members, managers, attorney, successor, predecessors, and assigns." *Id.* at *3.

or servicers . . . or any affiliated entities," and "the agents, [or] servicers . . . of the other [party]."[4] 24 F. Supp. 3d at 289-90.

Neither *Booth* nor *Moss* is availing to Weyerhaeuser's position. The HPA's arbitration provisions only apply to "Buyer" and "Seller." Those terms are unambiguously defined as the home purchaser and "Pulte Homes of PA, Limited Partnership", and are thus plainly distinguishable from the definitions of "We" or "Us" in *Booth* or "related third parties" in *Moss*. Mot. to Compel. Ex. A at 30, 41. To the extent there is any reference to non-signatories in the HPA's arbitration provision, the plain language indicates that such parties could only be added *at Pulte's option*. *Id.* at 41 ("Seller may at, at Seller's option, include Seller's subcontractors and suppliers and other parties in the arbitration."). This language imposes a precondition for arbitration with third parties: a dispute between the homeowner and Pulte. Thus, unlike the plaintiffs in *Booth* and *Moss*, whose agreements made arbitration foreseeable with respect to an

---

[4] The five agreements in *Moss* were described by the Court as:

> Here, the language of the five loan agreements reveals that plaintiffs consented to arbitrate not only with the signatory lenders, but also with the lenders' agents and servicers. (Pl. Ex. 1 at 645 ("any of [the lenders'] agents or servicers … or any affiliated entities (hereinafter collectively referred to as "related third parties").");  Pl. Ex. 2 at 659 (same); Pl. Ex. 3 at 689 (same); Pl. Ex. 4 ("or the agents, [or] servicers … of the other"); Pl. Ex. 5 (same).).
>
> […]
>
> The fifth agreement did not use terms "servicer" or "agent" in the payment authorization provision, but it did refer to the "network" and described the lender's role as "initiat[ing]" the electronic funds transfers, which suggest that the task would be compled by a third party. (Pl. Ex. 3 at 690.) Furthermore, the fifth agreement contained the type of broadest arbitration provision, in which plaintiff Moss agreed to arbitrate "all claim against … agents … or affiliated entities." (*Id.* at 694.)

24 F. Supp. 3d at 289-90.

expansive group of possible defendants (by including them in the arbitration provisions without any preconditions), arbitration with third parties pursuant to the HPA was only foreseeable to Named Plaintiffs where there was a dispute between them and Pulte, and Pulte joined a third party. Put another way, plaintiffs in *Booth* and *Moss* "bargained" for arbitration provisions that allowed third parties to compel arbitration independent of any other party's right to arbitration. The unambiguous language of the HPA's arbitration provision, however, makes a third-party's right to compel arbitration wholly derivative of Pulte's—if Pulte did not elect to arbitrate, no third party has that right pursuant to the HPA. As a result, it is not foreseeable that the HPA would require Named Plaintiffs to arbitrate claims related to the HPA against Weyerhaeuser in litigation to which Pulte is not a party.

The terms of the limited warranty limit the foreseeability of compelled arbitration in the same manner as the HPA. *See* Mot. Compel Ex. G at 52 ("*[E]ither party* must submit any unresolved claim or dispute concerning your home or this Warranty…to binding arbitration.") (emphasis added); *id.* at 41 ("This section provides a general overview of the Pultegroup Home Protection Plan, which consists of the limited warranty and the Performance Standards…*provided by Pultegroup…through the building subsidiary identified in your purchase agreement* for the home (the "Builder"). The specific details, limitations, and conditions of the Warranty *are provided to you (the "Homeowner")* in this book.") (emphasis added). To the extent third parties are referenced in the limited warranty's arbitration provisions, the limited warranty provides: "*either party* may join as a party to the arbitration any…supplier…involved in the dispute." *Id.* at 53 (emphasis supplied). Although broader than the HPA in that it would permit the Homeowner to add a third party to the arbitration, this language imposes the same necessary precondition for the obligation to arbitrate with third parties as the HPA: a dispute between the Homeowner and

9

Pulte. Accordingly, it was only foreseeable that Named Plaintiffs, as homeowners, would have to arbitrate claims against third parties if they, or Pulte, elected to do so.

The Court also disagrees with Weyerhaeuser's citation to *Booth* for the proposition that foreseeability is the touchstone of a "close relationship."[5] Reply 5. That Court's discussion of foreseeability is narrow, limited to the context of the facts before it. As an initial matter, the formulation of the applicable standard in *Booth* makes no mention of foreseeability. Rather, the Court stated:

> Determining whether a close relationship exists between the entities involved requires **"examin[ing] the relationship of the alleged wrong to the nonsignatory's obligations and duties in the contract."** *Miron*, 342 F. Supp. 2d at 333 (internal citations omitted). **"Non-signatories … can enforce an [arbitration] agreement when there is an obvious and close nexus between nonsignatories and the contract or the contract parties"** such that it "is the signing parties' intent" to hold that party to the arbitration provision. *Dodds v. Pulte Home Corp.*, 909 A.2d 348, 351 (Pa. Super. 2006).

2014 WL 3952945 at *5 (emphasis added). In fact, the Court only used the word "foreseeability" once, after noting plaintiffs in *other cases challenging banks' roles in payday loans*—decided under different states' laws—in different jurisdictions—were compelled to arbitrate their claims. *Id.* ("The signatory plaintiffs [in cases decided by the U.S. District Courts for the District of Columbia, Connecticut, and Eastern District of New York] were not permitted to deny the foreseeability of having to arbitrate with the banks.").[6] Furthermore, neither *Miron v. BDO Seidman, LLP* nor *Dodds v. Pulte Home Corporation*—the two cases from which *Booth* derives

---

[5] *Moss* is further distinguishable because it applied the law of New York, and the case at bar calls for the application of Pennsylvania law. 24 F. Supp. 3d at 286 n.6 ("[T]he Court has applied New York law to the extent it is not preempted by the Federal Arbitration Act.") (internal quotation omitted).

[6] The three cases cited in are *Riley v. BMO Harris Bank, N.A.*, 61 F. Supp. 3d 92 (D. D.C. 2014), *Graham v. BMO Harris Bank, N.A.*, No. 13-1460, 2014 WL 4090548 (D. Conn. July 16, 2014), and *Moss*, 24 F. Supp. 3d at 281.

10

its formulation of the pertinent inquiry—discuss the concept of foreseeability. *See Miron*, 342 F. Supp. 2d at 333 (noting the inquiry "requires a court to determine whether there is a close relationship between the entities involved"); *Dodds*, 909 A.2d at 351 (noting that non-signatories can compel arbitration where "there is an obvious and close nexus between the non-signatories and the contract or the contracting parties"). Absent binding authority to the contrary—which neither party has provided—the Court, therefore, declines to read foreseeability into the "close relationship" test.

The Court finds that the issue before it is similar to the one presented in *In re Volkswagen Timing Chain Product Liability Litigation*. No. 16-2765, 2017 WL 1902160 (D.N.J. May 8, 2017).[7] In that case, the Court denied a motion to compel arbitration. The named plaintiffs—including one from Pennsylvania—brought nationwide and state-specific class actions against various Volkswagen and Audi entities for manufacturing and marketing defective engines, which were included in vehicles plaintiffs bought or leased from authorized Volkswagen or Audi dealerships. *Id.* at *1-2. One of the Volkswagen entities, VW America, moved to compel arbitration, arguing that the plaintiffs should be equitably estopped from opposing arbitration because of the arbitration provisions in their sale and/or lease agreements. *Id.* at *3, 8. The Court denied the motion. *Id.* at *8. It found that there was no "close relationship" because "[a]t the time [p]laintiffs acquired their vehicles, they entered into a purchase and/or lease agreement between themselves *and the dealership*. A member of each dealership presented this document. [And] [t]he agreement only contained the dealership's name and the various [p]laintiffs' names." Under those

---

[7] Although the Court cites some New Jersey authority, the Court applied the formulation of equitable estoppel doctrine contained in the Third Circuit's decision in *Dupont*. *See Volkswagen*, 2017 WL 1902160 at *9.

11

circumstances, the Court found that "there was no relationship, let alone a close one, that supports the application of estoppel." *Id.* at *9.

The relationship between Named Plaintiffs and Weyerhaeuser is at least as attenuated as the relationship in *Volkswagen*. Weyerhaeuser was not a signatory to the HPA or the limited warranty. As the documents make clear, those agreements were entered into by the individual Named Plaintiffs and Pulte, not Weyerhaeuser, Mot. to Compel Ex. A at 44, just as the lease/purchase agreements were executed between the *Volkswagen* plaintiffs and authorized dealers, not VW America. Moreover, those agreements contain only the names of the Named Plaintiffs and Pulte (or its affiliates, amongst whom Weyerhaeuser is not listed), and do not reference Weyerhaeuser in any way (as it conceded at oral argument). *See id. passim*. These facts, alone, preclude a finding of a sufficiently close relationship, as they did in *Volkswagen*. The relationship is even more attenuated here than in *Volkswagen* because, as Weyerhaeuser conceded at oral argument, its products are not sold to builders like Pulte (which would parallel the manufacturer-dealer relationships in *Volkswagen*). Rather, Weyerhaeuser admitted that its joists were sold to distributors, who, in turn, sold them to builders (like Pulte), who then sell homes containing the joists to homeowners, like Named Plaintiffs. Under these circumstances, the Court finds Weyerhaeuser cannot be characterized as "close" to a transaction two bends down the stream of commerce.[8]

---

[8] The Court acknowledges that each party filed a notice of supplemental authority apprising the Court of the mixed-results of Weyerhaeuser's attempts to compel arbitration in other litigation concerning its allegedly defective joists. None of the cases provided—*Hunt v. Dream Finders Homes, LLC*, Weyerhaeuser Notice Suppl. Auth. Ex. B, *Walewski v. Weyerhaeuser Co.*, Named Pls.' Notice Suppl. Auth. Ex. 1, and *Smith v. Weyerhaeuser Co.*, Weyerhaeuser Notice Suppl. Auth. Ex. A—is particularly helpful to the Court. The portions of *Hunt* and *Walewski* addressing equitable estoppel each applied Colorado's formulation of the doctrine, which differs from the one applicable here. In *Smith*, the Court did not apply estoppel principles; rather, it considered whether Weyerhaeuser was covered by the arbitration provision at-issue's definition of "Seller," which

The relationship between Weyerhaeuser, Pulte, and Named Plaintiffs is too attenuated to apply equitable estoppel.[9] As a result, the Court finds there is no enforceable arbitration agreement between Named Plaintiffs and Weyerhaeuser, and its motion to compel must, therefore, be denied.

**CONCLUSION**

Defendant Weyerhaeuser invokes equitable estoppel to compel Named Plaintiffs' to comply with an arbitration provision in an agreement between Named Plaintiffs and Pulte, their homes' builder. Because there is no close relationship between Weyerhaeuser and the parties to the agreements it seeks to enforce, or those agreements themselves, the application of equitable estoppel is inappropriate. As a result, the Court finds there is no enforceable agreement to arbitrate between Weyerhaeuser and Named Plaintiffs. The motion to compel will, therefore, be denied.

An appropriate order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, C.J.

---

expressly included suppliers of materials. As has been noted throughout, neither the definition of "Seller" under the HPA, nor "Builder" under the limited warranty, can be read to include Weyerhaeuser. Accordingly, none of these cases impacts the Court's analysis.

[9] Based on this conclusion, the Court need not address the second aspect of the equitable estoppel analysis—whether Named Plaintiffs' claims are intertwined with the HPA and limited warranty.